MURDOCK, Justice
(concurring specially).
I share many of the concerns expressed by my colleagues, not the least of which is the concern for religious liberty and the concern expressed by Justice Bolin in Part II of his writing. ' I write not to repeat those concerns, but to offer some related thoughts.
[[Image here]]
A group of judges can declare all it wants that two people of the same sex can “marry,” but in the words of The Federalist No. 78,[43] they cannot change “the nature and reason of the thing” called marriage. In Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953), Justice Jackson warned that “it is prudent to assume that the scope and reach of the Fourteenth Amendment will continue to be unknown and unknowable, that what *612 seems established by one decision is apt to be unsettled by another, and that its interpretation mil be more or less swayed by contemporary intellectual fashions and political currents.” 344 U.S. at 534 (Jackson, J., concurring in the result) (emphasis added). He further observed that the Supreme Court “may look upon this unstable prospect complacently, but state judges cannot.” Id.[44] Justice Jackson summarized the problem this way:
“Rightly or wrongly, the belief is widely held by the practicing profession that this Court no longer respects impersonal rules of law but is guided in these matters by personal impressions which from time to time may be shared by a majority of Justices. Whatever has been intended, this Court also has generated an impression in much of the judiciary that regard for precedents and authorities is obsolete, that words no longer mean what they have always meant to the profession, that the law knows no fixed principles.”
344 U.S. at 535 (emphasis added). Justice Jackson’s words were prescient.
Among other things, Justice Jackson’s concerns bring to mind this colloquy:
“ T don’t know what you mean by “glory,” ’ Alice said.
“Humpty Dumpty smiled contemptuously. ‘Of course you don’t — till I tell you. I meant “there’s a nice knock-down argument for you!” ’
“ ‘But “glory” doesn’t mean “a nice knock-down argument,” ’ Alice objected.
“ When I use a word,’ Humpty Dumpty said in a rather scornful tone, ‘it means just what I choose it to mean — neither more nor less.’
“ ‘The question is,’ said Alice, ‘whether you can make words mean different things.’
“ ‘The question is,’ said Humpty Dumpty, ‘which is to be master — that’s all.’ ”
Lewis Carroll, Through the Looking-Glass, and What Alice Found There (Macmillan and Co., London 1872).
At least Carroll’s protagonist was undertaking only to declare contemporaneously the meanings of his own words, not proposing to change the meanings of words used by others at some time in the past. At best, the federal courts are applying a new meaning to words after they have been spoken and written by others, including the Supreme Court itself in earlier opinions, state legislatures, and the people themselves in organic state law. Even viewed in this manner, what the federal courts are doing has the gravest of consequences. If we cannot depend upon the meaning of words as understood at the time the words were chosen by their speaker or writer, the ability to communicate any idea from one time to another is lost. The ability to communicate any truth from one time to another is lost. And therewith the rule of law.
In reality, however, the federal courts, including the Supreme Court, are doing something even more radical than “merely” changing the meaning of the word “marriage” after its use by others. They *613 purport to engage in alchemy. To' declare, as if they could do so, a change in the essential nature of the thing itself. That they purport to do so is appropriately met with the consternation expressed by Chief Justice Roberts when-he exclaimed: “Just who do we think we are?” Obergefell v. Hodges, 576 U.S. —, —, 135 S.Ct. 2584, 2612, 192 L.Ed.2d 609 (2015) (Roberts, C.J., dissenting).
Governments did not and do not create the institution of marriage. A civil government can choose to recognize that institution; it can choose to affirm it; and it can even take steps to encourage it. Governments throughout history have done so. But governments cannot change its essential nature. Marriage is what it is. No less so than any naturally occurring element on the periodic table.[45]
Yet, here we are. The courts undertake to change — or at least declare a change in — the essential nature of the thing itself. It is not just that the existence of such an ability would make it impossible to communicate and maintain a rule of law (which it does) or even to communicate truths from one person or time to another (which it also does). To assume the ability to declare such a change presumes there is no objectively ascertainable, universally applicable and immutable — “unalienable” in the words of the Declaration of Independence — truth about the thing.
The postmodern philosophy of truth this represents is that each individual can decide for himself or herself what is true. In contrast, the Declaration of Independence and the United States Constitution reflect, and the drafters of the one and framers and ratifiers of the other believed in, a philosophy of objectively ascertainable truth. Truth that is external to each of us. Truth that informs a common value system against which to consider one another’s ideas and conduct. Only out of such a universal truth can there arise “certain rights” that can themselves be universal— and unalienable.
So, in the end, perhaps the real question is this: Can the United States Supreme Court decide upon some philosophy of truth different from that assumed by the framers of the Constitution -and by the Constitution itself — the same Constitution that gives that Court its very existence and its authority to make decisions? And impose this different philosophy of truth upon the people of this country? Where is the authority for that?

. The Federalist No. 78, at 404 (Alexander Hamilton) (George W. Carey and James .McClellan eds., Liberty Fund, 2001),

. Indeed, state courts often, as here, are the ones left with the task of enforcing whatever is left of state law in the aftermath of a decision such as Obergefell v. Hodges, 576 U.S. —, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015). See Ex parte State of Alabama ex rel. Alabama Policy Inst., 200 So.3d 495, 604 (Ala.2015) (Bolin, J., concurring specially, Part II); Ex parte State of Alabama ex rel. Alabama Policy Inst., 200 So.3d 495, 531 n. 19 and accompanying text (Ala.2015); see also Ex parte Davis, [Ms. 1140456, Feb. 11, 2015] — So.3d -, - (Ala.2015) (Murdock, J„ concurring specially).

. Man can recognize, for example, the presence of oxygen in the atmosphere. He can affirm that oxygen is a good thing, and perhaps even maintain vegetation to encourage its production. But man can not change what oxygen is. Man might declare that henceforth oxygen atoms will have some different number or arrangement of protons, neutrons, and electrons, but that will not make it so. Nature-has made oxygen as it is; it has made marriage as it is.
As John Finnis put it:
"[L]aw is both secondary or even subordinate to, while regulating, other social institutions which it does not institute, whether they be reasonable and good (like proper forms of marriage and family, or less ambitious kinds of promising, not to mention religious communities and practices), or unreasonable, vicious, and harmful (like prostitution, slavery, or the vendetta). We • should not imagine that market institutions or marriages or corporations await the emergence of ‘power-conferring’ rules of law. Legal rules are often ratificatoiy and regulative rather than truly constitutive, whatever their legal form and their role in creating the law’s versions of the social practices and institutions upon which it, so to speak, supervenes."
John Finnis, Philosophy of Law': Collected Essays: Vol. TV 118 (Oxford Univ. Press 2011).